**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES D. HOOD, | ) | CASE NO. 1:14-CV-681 |
| | ) | |
| Petitioner, | ) | JUDGE ZOUHARY |
| | ) | |
| v. | ) | MAGISTRATE JUDGE VECCHIARELLI |
| | ) | |
| CHRISTOPHER LAROSE, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2). Before the court is the petition of James D. Hood ("Hood" or "Petitioner") for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254. Hood is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to journal entry of sentence in the case of *State of Ohio vs. Hood*, Case No. CR-09-523219 (Cuyahoga County Aug. 8, 2009). (Doc. No. 7-1 at Ex. 5.) For the reasons set forth below, it is recommended that Hood's petition be DISMISSED with prejudice.

## I. Factual Background

The state appellate court reviewing Petitioner's direct appeal noted the following relevant facts:

> In the early morning hours of January 26, 2009, defendant-appellant James Hood allegedly was one of four men who burst into a Cleveland home and robbed at gunpoint nearly a dozen people who had gathered to celebrate the birthdays of friends and family. A co-conspirator, Samuel Peet, was shot dead during the course of the robbery. Hood was arrested and charged with murder and multiple counts of aggravated burglary, aggravated robbery, and kidnapping.

As part of the proof to establish Hood's involvement in the crimes, the state introduced cell-phone records that it argued showed his communication with the other co-conspirators and his whereabouts during the early morning in question.

* * *

In the late evening of January 25, 2009, a group of friends gathered in the basement of Sharon Jackson's home on Parkview Avenue in Cleveland to play cards and celebrate the birthdays of Denotra Jones and her son, Rodney. Among the guests that evening was one of the alleged co-conspirators, Terrence Davis, also known as "TD." According to Rodney Jones, Davis's presence was unusual: Davis had not joined the group in over a year, and he left the party several times throughout the evening. TD had met earlier that day with Samuel Peet and the other co-conspirators – Hood and Kareem Hill – and told them about the party.

Jerrell Jackson, homeowner Sharon Jackson's son, was the first person to be confronted by the assailants. He had walked some guests to their cars at around 5:00 a.m.; when he went back inside, there were four men in the hallway wearing masks and carrying guns. Jerrell noticed that one gun was an Uzi. Jerrell ran down into the basement, yelling a warning to everyone. Sharon Jackson, who had fallen asleep on a couch in her basement, was awakened by the commotion; she saw Jerrell being followed into the basement by four men wearing masks and carrying guns. She described the guns as two 9mm handguns, one Uzi, and one handgun with a long chrome barrel. The robbers made the victims strip, then searched the clothing and took money and cell phones.

Nine of the eleven victims testified at trial. They described the same basic facts – men in dark clothing, wielding guns, stormed into the basement, ordered some of the victims to remove their clothes, and stole money and cell phones from them at gunpoint. Some witnesses differed on the number of assailants, from two to four, but the victims were robbed in two separate rooms of the basement. At some point, gunshots were heard. One of the co-conspirators, Peet, was later found dead nearby, in a yard several houses away.

Several of the victims were able to identify him as one of the assailants due to his distinctive coat. He had been shot twice from close proximity; on his body were two cell phones belonging to victims and $345 in cash.

Earlier that morning, around 4:00 a.m., police received a report of a male pointing a gun at another male in the area of East 104th Street and Sophia Avenue, near where Hood lived. En route to the scene, the officers observed a green Jeep Cherokee stopped in the middle of Parkview Avenue with its lights on. As the officers approached, the Jeep sped away. The officers pursued the Jeep and were able to get a partial plate number, "EOF," before losing sight of the vehicle. The same officers were called to help investigate the Parkview Avenue break-in and were told that a sport utility vehicle was involved in the crime. Shortly after the break-in, a green Cherokee, license plate number EOF 7079, was spotted at a local McDonald's. Cash, a mask, and two victims' cell phones were found inside. Hood, his co-defendant Kareem Hill, and William Sparks had been removed from the vehicle and arrested. At the time of his arrest, Hood had $411.25 in cash in his possession. Hill eventually testified against Hood.

Hill initially lied to police and denied any involvement in the crimes. But when a latex glove found at the scene tested positive for Hill's DNA, Hill pleaded guilty to reduced charges and agreed to testify truthfully against Hood.

Hill knew his co-conspirators Hood, Davis, and Peet from the neighborhood where he grew up. Hill was 18 at the time of the crimes; Hood was older – he was 29 at the time of the trial, according to his attorney. In the hours before the robbery, Hill and Hood met Davis and Peet at a bar. The four discussed robbing a card game on Parkview Avenue. Davis left the bar to go to the party. Davis eventually returned to the bar and laid out the specifics about the party situation.

They all left the bar – Davis and Peet in one car, and Hill and Hood in Hill's green Jeep Cherokee. Hood and Hill went to Hood's house on Sophia Avenue to pick up guns. Hood went into his house and returned to the vehicle with a semiautomatic pistol, an Uzi, and latex gloves. Hill and Hood then drove to Parkview Avenue, where they saw Peet standing in a driveway near the target house; they let Peet

> get into the back seat of the Jeep. Peet had a gun.
>
> The three waited in the car. When Davis approached and informed them that the back door of the target house was open, Hood and Peet left the vehicle while Hill parked on the next street. Hill then cut through back yards to meet the others. All had weapons and wore hats or masks; Hill, Hood, and Davis wore latex gloves. Hill carried a black handgun, Peet carried a long silver revolver, Davis carried a black pistol, and Hood carried an Uzi.
>
> Hill testified that he and his cohorts took money and cell phones from the victims. At one point, there was an argument between Hood and Peet – Hood had accused Peet of stealing money from the pile of cash that was to be divided. Davis broke up the altercation by announcing it was time to leave.
>
> Hill ran up the stairs and outside; he was outside when he heard gunshots from inside the house. He never saw Peet leave the house. Hill and Hood left in Hill's Jeep while Davis went off in another direction.
>
> Hill and Hood returned to Hood's house on Sophia to drop off the guns. Hood went inside. Hood returned to the Jeep, and the two picked up Hill's friend, William Sparks, who Hill says had called him for a ride to McDonald's. Hill let Sparks drive. They went to McDonald's, where police stopped and arrested the three. The state ultimately did not pursue charges against Sparks.

*State v. Hood*, 984 N.E.2d 1057, 135 Ohio St.3d 137 (Ohio 2012) ("*Hood II*").

## II. State Procedural History

### A. State Trial Court Proceedings

In April 2009, the State filed an indictment charging Petitioner with: one count each of felony murder and murder; 11 counts of kidnaping; 12 counts of aggravated robbery; and possession of a weapon under disability. (Doc. No. 7-1 at Ex. 1.) The indictment included firearm specifications for each of the relevant counts. (*Id.*)

The state trial court conducted a trial in July 2009. During the trial, the State offered records, obtained by police officers investigating the robbery, related to cell phones used by Petitioner and Hill on the night of the robbery. During the direct examination of Hill, the State attempted to introduce the cell phone records. (Tr. 977.) Petitioner's counsel objected on the basis that the records were not authenticated. (Tr. 978-79.) The trial court overruled the objection on the basis that the State would eventually offer the testimony of an individual who could authenticate the records. (Tr. 981-82.) During his cross-examination of Hill, Petitioner's counsel noted that the records reflected calls between Petitioner and Hill's cell phones during a period of time that Hill had testified the two men were together. (Tr. 1045.) Hill could not explain why the records reflected those calls, as he was in a vehicle with Petitioner at the times of the calls. (Tr. 1045-47.)

Detective Henry Veverka testified that, after obtaining the cell phone numbers for Petitioner and Hill, he sent a subpoena to the cell phone provider and obtained "subscriber info and in and out calls for the day in question." (Trial Transcript ("Tr.") at 1208-09.) Detective Veverka stated that he used the records, along with records related to the location of various cell phone towers, to determine that there were calls placed from Petitioner's cell phone in the vicinity of the robbery on the relevant date. (Tr. at 1211.) The calls were placed between 10:00 p.m. and 2:00 a.m., and then again at 6:24 a.m. (Tr. 1211-12.) Detective Veverka testified that, based on the records, it appeared to him that Petitioner, Hill and Davis were in the vicinity of the robbery at the time that it occurred. (Tr. 1215-16.)

On cross-examination, Detective Veverka conceded that he was not an expert in

cell phones or in cell phone towers. (Tr. 1221.) He also conceded that he did not know the locations of all of the towers that appeared in the records. (Tr. 1220-22.) After Veverka's cross-examination, Petitioner's counsel renewed his objection the cell phone records, arguing that the State had not properly authenticated them. (Tr. 1236-37.) The trial court admitted the records into evidence. (Tr. 1238-39.)

After the close of evidence, the jury convicted Petitioner of felony murder; nine counts of kidnaping; nine counts of aggravated robbery; and the firearm specifications. (Doc. No. 7-1 at Ex. 5.) The state trial court acquitted Petitioner of possessing a weapon under a disability. (*Id*.) The trial court sentenced Petitioner to concurrent and consecutive sentences totaling 21 years to life. (*Id*.)

**B. Direct Appeal**

Petitioner, through new counsel, filed a timely notice of appeal, and asserted the following assignments of error on direct appeal:

I. The trial court erred by allowing cell phone records to be admitted into evidence without being properly authenticated in violation of the Confrontation Clause

II. The Defendant's right to a speedy trial was violated in that he was not brought to trial within the statutory time.

III. The Defendant's convictions are against the manifest weight of the evidence.

IV. The Defendant was materially prejudiced by an improper comment made [by] the State during closing argument.

(Doc. No. 7-1 at Ex. 7.) In November 2010, the state appellate court affirmed Petitioner's conviction. *State v. Hood*, No. 93854, 2010-Ohio05477 (Ohio App. Ct. Nov.

10, 2010).

Petitioner, through counsel, filed a timely notice of appeal in the Ohio Supreme Court, and asserted a single proposition of law in his memorandum in support of jurisdiction:

> Cell phone records are not admissible as business records without proper authentication. The admission of unauthenticated cell phone records under the business records exception violates the Confrontation Clause of the Sixth Amendment to the United States Constitution.

(Doc. No. 7-1 at Ex. 11.) The Ohio Supreme Court accepted jurisdiction, *State v. Hood*, 942 N.E.2d 384 (Table), 128 Ohio St.3d 1411 (Ohio 2011), and, in December 2012, affirmed Petitioner's conviction, 984 N.E.2d 929, 134 Ohio St.3d 595 (Ohio 2012) ("*Hood I*"), finding that, although the admission of the cell phone records violated Petitioner's rights under the Confrontation Clause, the constitutional error was harmless. The State filed a motion to reconsider the judgment, requesting that the Ohio Supreme Court modify portions of the opinion in *Hood I* that were not outcome determinative. (Doc. No. 7-1 at Ex. 21.) Thereafter, the Ohio Supreme Court granted the State's motion to reconsider, vacated its decision in *Hood I*, and replaced it with the decision in *Hood II*.[1] (Doc. No. 7-1 at Ex. 24.) In *Hood II*, the Ohio Supreme Court

---

[1] In *Hood I*, the Ohio Supreme Court made the general statement that, "A hearsay violation itself violates the Confrontation Clause, and thus requires a heightened harmless-error analysis." 984 N.E.2d at 937, 134 Ohio St.3d at 604. In *Hood II*, the Ohio Supreme Court acknowledged that this statement was "overbroad and was made in error." 984 N.E.2d at 1059, 135 Ohio St.3d at 138. The Ohio Supreme Court clarified its reasoning in the case:

> Upon reconsideration, we modify the opinion to clarify that it is not the hearsay nature of the cell phone records at issue that made their admission constitutional error. Instead, it was their lack of authentication as business records that made their

again affirmed Petitioner's conviction. *Hood II*, 984 N.E.2d at 1067, 135 Ohio St. 3d at 149.[2]

### III. Proceedings in This Court

In March 2014, Petitioner filed his § 2254 petition in this Court. He asserts single ground for relief, set forth as in his petition (grammar and punctuation as in original):

> The trial court erred by allowing cell phone records to be admitted into evidence without being properly authenticated in violation of the Confrontation Clause.
>
> Supporting Facts: When testimony by the Detective came into hearing of the jury, without me knowing that he had hand wrote the record and I was not allow to know that testimony needed some support by some other person, my attorney never informed me about how this evidence would be allowed, when the information was made known, I couldn't be in the location that was stated. Somehow, this evidence never was able to be effectively given a prior hearing for whatever the facts failed to reveal, so that I could have had a method to make a defense against the usage. Then when I wanted to see who ordered the records and

---

> admission unconstitutional under the Confrontation Clause, because without that authentication, the records cannot be considered nontestimonial.

984 N.E.2d at 1059, 135 Ohio St.3d at 138. In *Hood II*, the Ohio Supreme Court again determined that, although the admission of the cell phone records violated Petitioner's constitutional rights, the error was harmless. 984 N.E.2d at 1066-67, 135 Ohio St.3d at 147-48.

[2] In June 2010, while his direct appeal was pending in the state appellate court, Petitioner, *pro se*, filed a motion for a new trial in which he argued that he was innocent, relying on an affdavit in which Hill purportedly recanted his trial testimony and asserted that Petitioner was not involved in the January 2009 robbery. (Doc. No. 7-1 at Ex. 25.) In October 2010, the state trial court denied the motion. (Doc. No. 7-1 at Ex. 27.) Petitioner filed a timely notice of appeal. (Doc. No. 7-1 at Ex. 28.) In November 2010, the state appellate court dismissed the appeal after Petitioner failed to file a praecipe. (Doc. No. 7-1 at Ex. 29.)

> maybe by what means, everyone said, it didn't matter. So now with the public defender telling me that I would be granted relief on this one issue, the others like my speedy trial, when the original defense attorney thought the cellphone records had been properly ordered. I asked that a motion or something to prevent this should have been filed with the appellant counsel, but never was given an answer.
>
> This one issue seems to be grounded in whether what i was misled to believe was wrong, that being what the Ohio Supreme Court said, as harmless and even constitutional error, but then said it wasn't, why would I waive the other assignments of error if not for the belief I would be granted a new trial on actually being innocent of the charges against me.
>
> I honestly do not understand how the harmless error by the supreme court and counsel then told me that it would go to the U.S. Supreme Court, but let the time lapse and now I am before this District Court on whether the sole proposition of law and all the assignments of error should have been preserved?

(Doc. No. 1 at 6-7.)[3]

---

[3] The facts alleged in support of the sole ground for relief in Petitioner's petition could be liberally construed to assert a claim that Petitioner received ineffective assistance of counsel in his appeal to the Ohio Supreme Court when his counsel failed to raise all of the assignments of error from Petitioner's direct appeal in his memorandum in support of jurisdiction. *See Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) (requiring federal courts to liberally construe *pro se* habeas petitions). In his Traverse, Petitioner affirmatively states that he instructed the attorney who represented him in his appeal to the Ohio Supreme Court to raise all of the assignments of error that Petitioner had asserted in his direct appeal. (Doc. No. 14 at 3-4.)

Any such claim, however, would not be cognizable on habeas, as it is well established that the right to the assistance of counsel, which encompasses the right to the effective assistance of counsel, does not extend beyond a defendant's appeal of right in state court. *Coleman v. Thompson*, 501 U.S. 722, 756-57 (1991). Accordingly, Petitioner was not entitled to the effective assistance of counsel in his discretionary appeal to the Ohio Supreme Court.

## IV. Procedural Issues

### A. Jurisdiction

A state prisoner may file a § 2254 petition in "the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him." 28 U.S.C. § 2241(d). The Court of Common Pleas of Cuyahoga County, Ohio sentenced Petitioner. (Doc. No. 7-1 at Ex. 5.) Cuyahoga County is within this Court's geographic jurisdiction. *See* 28 U.S.C. § 115(a). Accordingly, this Court has jurisdiction over Petitioner's petition.

### B. Exhaustion and Procedural Default

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus. *See* 28 U.S.C. § 2254(b) and (c); *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. McMackin*, 935 F.2d 790, 793 (6th Cir. 1991). If any state procedures for relief remain available, the petitioner has not exhausted his state remedies, and a federal court must dismiss his petition. *See Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994). The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on all the petitioner's claims. *See Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990). Here, the record reflects that Petitioner asserted his sole ground for relief in his appeal to the Ohio Supreme Court and, thus, the ground for relief is exhausted.

## V. Merits of Petitioner's Claim

### A. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ( "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus. As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. *See Carey v. Musladin*, 549 U.S. 70 (2006); *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000). Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction. *See Carey*, 549 U.S. at 74.

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court. Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly established Federal law, as

> determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 404-05 (emphasis added by the quoting court). A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result. *Id.* at 405-06. A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Id*. at 520-21 (internal citations and quotation marks omitted). This Court applies this deferential standard of review to the Ohio Supreme Court's ruling on Petitioner's ground for relief.

**B. Application of the Standard**

In his sole ground for relief, Petitioner argues that the state trial court violated his Sixth Amendment right to confrontation when it admitted the cell phone records into evidence during his trial. In its decision affirming his conviction, the Ohio Supreme Court concluded that the records had, in fact, been admitted in violation of the Confrontation Clause because they were not properly authenticated:

> Because cell-phone records are generally business records

> that are not prepared for litigation and are thus not testimonial, the Confrontation Clause does not affect their admissibility. But in this case, there is no assurance that the records at issue are business records.
>
> * * *
>
> Here, there was simply no foundation laid by a custodian of the record or by any other qualified witness. Detective Veverka was not a custodian of the records. He did not prepare or keep the phone records as part of a regularly conducted business activity.
>
> * * *
>
> Thus, the cell-phone records in this case were not authenticated as business records, and that fact affects their status in regard to the Confrontation Clause. If the records had been authenticated, we could be sure that they were not testimonial, that is, that they were not prepared for use at trial. Without knowing that they were prepared in the ordinary course of a business . . . we cannot determine that they are nontestimonial. We thus find that the admission of the records in this case was constitutional error.

*Hood II*, 984 N.E.2d at 1065-66, 135 Ohio St.3d at 146-47. The court, however, also concluded that the constitutional error was "harmless beyond a reasonable doubt." 984 N.E.2d at 1066-67, 135 Ohio St.3d at 147 (citing *State v. Williams*, 452 N.E.2d 1323, 6 Ohio St.3d 281 (Ohio 1983)). The Ohio Supreme Court reviewed the evidence other than the cell phone records, and determined that it was "overwhelming," particularly in light of Hill's testimony and the forensic evidence at the scene. 984 N.E.2d at 1066-67, 135 Ohio St.3d at 147-49.

It is well established that Confrontation Clause errors are subject to harmless error review. *See Vasquez v. Jones*, 496 F.3d 564, 574 (6th Cir. 2007). In reviewing a state court's decision that a constitutional error was harmless, a federal habeas court must "assess the prejudicial impact of constitutional error . . . under the . . . standard set

forth in *Brecht* [*v. Abrahamson*, 507 U.S. 619 (1993)]." *Fry v. Pliler*, 551 U.S. 112, 121 (2007). In *Brecht*, the United States Supreme Court determined that, in this context, a petitioner is entitled to habeas relief on the basis of constitutional error where the error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht*, 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).[4] To determine the effect of a constitutional error under the *Brecht* standard, this Court "consider[s] both the impact of the improperly admitted evidence and the overall weight of the evidence presented at trial." *Peterson v. Warren*, 311 F. App'x 798, 805 (6th Cir. 2009).

Here, in light of the other evidence of Petitioner's guilt, the admission of the unauthenticated cell phone records did not have a "substantial and injurious effect or influence in determining the jury's verdict." As the Ohio Supreme Court noted, the other

[4] The State argues that this Court should apply the standard of review set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967), under which a constitutional error is harmless only where a reviewing court can "declare a belief that [the error] was harmless beyond a reasonable doubt," with AEDPA deference. (Doc. No. 7 at 23-24.) The State's argument, however, relies on outdated case law. Prior to the Supreme Court's decision in *Fry*, the state court's review of the error at issue determined this Court's review. *Eddleman v. McKee*, 471 F.3d 576 (6th Cir. 2006). The State relies on *Eddleman* in making its argument. Under *Eddleman*, because the state appellate court found that there was constitutional error and engaged in harmless error review, this Court would review the error under the *Chapman* standard, applying AEDPA deference to the state court's conclusion. *See* *Eddleman*, 471 F.3d at 585. In *Eddleman*, the Sixth Circuit determined that the *Brecht* standard applied only where the state court had not found error. *Id*. In *Fry*, decided in 2007, the Supreme Court concluded that the *Brecht* standard of review applied regardless of the state courts' review of the alleged constitutional error. *Fry*, 551 U.S. at 121-22. Accordingly, the decision in *Fry* overruled *Eddleman*. *See* *Vasquez*, 496 F.3d at 574-75 (noting that, after *Fry*, the *Brecht* standard of review applied "'whether or not the state appellate court recognized the error and reviewed it for harmlessness'") (quoting *Fry*, 551 U.S. at 121-22). Thus, the appropriate standard of review in this context is the standard announced in *Brecht*, regardless of whether the state court reviewed the constitutional error under a harmless error standard.

evidence at trial strongly supported the jury's verdict:

> The evidence of Hood's guilt was overwhelming. We first note that jurors did not have to believe that Hood pulled the trigger to find him responsible for Peet's death; they just had to find that he participated in the criminal act that led to Peet's death.[5] Kareem Hill was a co-conspirator and eyewitness; Hill's DNA was found at the scene. His version of events inside the house was consistent with testimony from the victims. He provided detailed testimony against Hood.
>
> Hill's testimony was, by itself, disastrous for the defense. And it was corroborated by other evidence. Hood's DNA was found in Hill's vehicle, on a cigar tip in the front ashtray; Hood could not be ruled out as a contributor to DNA found on the right and left rear interior passenger doors of Hill's vehicle. Peet could not be ruled out as a contributor of part of the mix of DNA found on the interior left rear passenger door, corroborating Hill's testimony that Hood and Peet had been together in Hill's vehicle.
>
> When police surrounded Hill's vehicle in the McDonald's parking lot following the robbery, Hood was inside. Also in the vehicle were cell phones stolen during the robbery, as well as cash. A large amount of cash was found in Hood's possession.
>
> What role did the cell-phone records play in Hood's conviction? Upon review, we conclude that the records were of minimal probative value and, at most, merely cumulative in effect. Veverka testified that cell-tower logs placed Hood in the vicinity of the crime. But there were no calls to or from Hood between 2:52 a.m. and 6:24 a.m. on the morning of the crime. The break-in occurred at around 5:00 a.m., so the cell towers do not place him in the vicinity at the crucial time.
>
> In one respect, the phone records could even be seen as weakening the state's case against Hood. As the defense pointed out during its cross-examination of Hill, the records

[5] The jury convicted Petitioner of murder under Ohio Revised Code § 2903.02(B), which provides that "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense that is a felony of the first or second degree and that is not [voluntary manslaughter] or [involuntary manslaughter]."

> reflect calls made between Hill and Hood at times when the two men were, according to Hill, together in Hill's car. Hill had no explanation why two people would communicate by phone when they were both inside the same car.
>
> Terrence Davis's records were also introduced. The records reveal no contact with Hood, but there is contact with Hill. This does back up Hill's testimony that conversations regarding planning occurred between someone using Hill's phone and Davis.
>
> But the key evidence – the evidence that places Hood inside the house participating in the crimes – does not depend in any way on the cell-phone records. DNA evidence proves that Hill was there, and Hill placed Hood there, armed with an Uzi, wearing latex gloves, and participating in the robberies. Victim testimony corroborated to a large extent Hill's version of events inside the house. Hood was in the vehicle containing the spoils of the robberies soon after they occurred. We thus conclude that the admission of the cell-phone records did not contribute to Hood's conviction and that their admission was harmless beyond a reasonable doubt.

*Hood II*, 984 N.E.2d at 1066-67, 135 Ohio St.3d at 147-49.

Review of the record in this case reveals that the Ohio Supreme Court's well reasoned opinion accurately reflects the testimony and evidence offered at trial. In his Traverse, Petitioner generally argues that the evidence against him was not reliable, noting, *inter alias*, that Hill received a plea deal in return for testifying against Petitioner.[6] This argument might be more persuasive had the cell phone records contained information that supported Petitioner's guilt, such that they bolstered

[6] Petitioner also devotes a substantial portion of his Traverse to arguing the merits of the constitutional violation. This Court does not consider the issue of whether the admission of the records violated Petitioner's Sixth Amendment rights. The state courts conceded that the violation occurred, but determined that the error was harmless. It is the issue of harmless error that is before this Court.

otherwise weak or circumstantial evidence. That was not the case here. Rather, as the Ohio Supreme Court noted, the cell phone records arguably weakened the State's case at trial because they reflected that Petitioner and Hill's cell phones were communicating with one another at a time when, according to Hill, the two men were in the same vehicle. Indeed, the record reflects that the cell phone records did very little to support the State's case at trial. The State's own witness conceded that, although the records placed Petitioner in the vicinity of the robbery during the early morning hours of the relevant date, they did not reflect whether he was there at the time that the robbery occurred. In other words, despite Petitioner's characterization of the remaining evidence against him, the record does not support the conclusion that the cell phone records actually influenced the jury's decision in this case. Accordingly, there is no basis for concluding that the admission of the cell phone records had "a substantial and injurious effect or influence in determining the jury's verdict."

## VI. Conclusion

For the reasons given above, the petition should be dismissed with prejudice.

Date: April 14, 2015

/s/ *Nancy A. Vecchiarelli*
United States Magistrate Judge

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**